## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 23-cv-22455-ALTMAN/Reid

**HEALTHCARE ALLY MANAGEMENT
OF CALIFORNIA, LLC**,

     *Plaintiff*,

*v.*

**UNITEDHEALTHCARE
SERVICES, INC.**,

     *Defendant.*

_____/

## ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

     Our Plaintiff, Healthcare Ally Management of California, LLC ("HAMOC"), accuses the

Defendant, UnitedHealthcare Services, Inc. ("UHC"), of failing "to make proper payments" to certain

medical providers "for surgical care, treatment and procedures provided to Patients, who are insureds,

members, policyholders, certificate-holders or otherwise covered for health, hospitalization and major

medical insurance through policies or certificates of insurance issued and underwritten by [UHC]."

Complaint [ECF No. 1] ¶ 10. UHC has moved to dismiss the Complaint on four different grounds.

*See generally* Motion to Dismiss ("Motion") [ECF No. 19].[1] After careful review, we **GRANT in PART**

and **DENY in PART** UHC's Motion.

### THE FACTS

     Between May 24, 2018, and December 27, 2019, twelve different patients—all insured by

UHC—underwent surgical procedures at one of three South Florida hospitals (the "Providers"):

---

[1] The Motion has been fully briefed and is ripe for adjudication. *See* Opposition to Defendant's Motion to Dismiss ("Response") [ECF No. 22]; Reply in Support of Motion to Dismiss ("Reply") [ECF No. 25].

Hollywood Regional Surgical Center ("HRSC"); Palm Beach Gardens Regional Surgical Center ("PBGRSC"); and Miami Regional Surgery Center ("MRSC"). *See* Complaint ¶¶ 37, 69, 101, 133, 165, 197, 229, 261, 293, 325, 357, 389. The Complaint's factual allegations about each of these twelve patients are substantially the same. An employee from the Providers would contact UHC and ask whether the insurer was prepared to pay the "usual, customary, reasonable, and allowed" UCR[2] rates for the relevant medical procedures—a question the UHC employee would always answer in the affirmative. *See, e.g.*, Complaint ¶¶ 41–42 ("[The Providers] asked: does Defendant pay based on UCR for [the relevant] procedure codes . . . and other similar codes within the same family? Defendant represented to [the Providers] that for services in connection with these procedure codes, Defendant pays the UCR rate."). When the Providers' employee asked if UHC "use[s] a Medicare Fee Schedule to pay for these procedure codes?" the UHC employee confirmed that its "payment would not be based on the Medicare Fee Schedule." *Id.* ¶¶ 43–44. UHC also never told the Providers that the patients' policies were "subject to certain exclusions, limitations or qualifications, which might result in denial of coverage, limitation of payment or any other method of payment unrelated to the UCR rate." *Id.* ¶ 46. The Providers "relied and provided services solely based on Defendant's statements, promises and representations." *Id.* ¶ 51.

According to HAMOC, however, UHC's representations to the Providers were false. UHC "knew or should have known that it would not be paying [the Providers] at the UCR rate" and knew that "it would be paying [the Providers] at Medicare rate." *Id.* ¶¶ 48–49. UHC also failed to inform the Providers that the patients' plans "might have an anti-assignment provision and that [UHC] would

---

[2] The "UCR rate" is usually "determined based on the amount providers usually, customarily, and reasonably charge for a given service in a given geographic area." *Urology Ctr. of Ga., LLC v. Blue Cross Blue Shield Health Plan of Ga., Inc.*, 2010 WL 797204, at *1 (M.D. Ga. Mar. 4, 2010) (Royal, J.).

only speak or direct correspondence to the Patient." *Id.* ¶ 59.[3] UHC then significantly underpaid the Providers for the medical procedures they performed. *See, e.g.*, *id.* ¶ 64 ("The total bill for Patient's services was $104,950.70. Defendant did not pay HRSC based on HRSC's billed charge as Defendant's payment was $3,155.85."); *id.* ¶ 96 ("The total bill for Patient's services was $327,156.25. Defendant did not pay HRSC based on HRSC's billed charge as Defendant's payment was $27,073.30."); *id.* ¶ 128 ("The total bill for Patient's services was $189,007.00. Defendant did not pay HRSC based on HRSC's billed charge as Defendant's payment was $17,350.80.").

The Providers then tried to secure additional payments from UHC to no avail. *See id.* ¶¶ 58, 61 ("Over the next couple of months, [the Providers] sent numerous appeal letters to [UHC] . . . to exhaust all of Patient's and HRSC's administrative remedies. . . . Despite the appeals, [UHC] refused to make any additional payment."). On August 31, 2022, the Providers "assigned Patients' underpaid/unpaid bills, including the right to file a lawsuit, to HAMOC[.]" *Id.* ¶ 9. With this assignment in hand, HAMOC filed our Complaint against UHC, asserting three counts. In Count 1, HAMOC alleges that UHC engaged in "negligent misrepresentation" by "falsely represent[ing] to [the Providers] that payment for services would be based on UCR and not Medicare." *Id.* ¶ 422. Count 2 advances a promissory-estoppel claim based on UHC's alleged "material representations and misrepresentations," which caused the Providers to act with "detrimental reliance thereon[.]" *Id.* ¶ 435. And Count 3 seeks, in the alternative, to "recover benefits and enforce rights to benefits" under the Employee Retirement Income Security Act of 1974 ("ERISA"). *Id.* ¶ 438; *see also, e.g.*, *id.* ¶ 58 ("In the alternative, pursuant to 29 U.S.C. §1132 (a)(1)(B), Defendant has failed to reimburse Patient and [the Providers] in accordance with the terms of Patient's ERISA Plan.").

---

[3] This is relevant because, "prior to services being rendered," the patients "assigned all rights to reimbursement for medical services" to the Providers. Complaint ¶ 54.

**THE LAW**

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To meet this "plausibility standard," a plaintiff must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Twombly*, 550 U.S. at 555). "[T]he standard 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the required element." *Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309–10 (11th Cir. 2008) (quoting *Twombly*, 550 U.S. at 545). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. On a motion to dismiss, "the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff." *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016). "The motion is granted only when the movant demonstrates that the complaint has failed to include 'enough facts to state a claim to relief that is plausible on its face.'" *Ibid.* (quoting *Twombly*, 550 U.S. at 570).

**ANALYSIS**

In its Motion, UHC advances four arguments. *First*, UHC contends that HAMOC "cannot maintain this lawsuit" as a matter of state law because it is a "debt collector . . . who has not registered in Florida," as required by FLA. STAT. §§ 559.544 and 559.553. Motion at 8. *Second*, UHC asks us to dismiss the Complaint because the allegations "are too indefinite to support any of its causes of action." *Ibid. Third*, UHC says that Counts 1 and 2 "are defensively preempted under ERISA and require dismissal with prejudice." *Id.* at 14. *Fourth*, UHC takes the unorthodox approach of asking us

4

to "reserve ruling" (pending discovery) on whether there are "anti-assignment provisions in [the] plan documents" that require dismissal. *Id.* at 16. Although we agree with UHC that Count 3 of the Complaint is too indefinite to support an ERISA claim, we reject the rest of its arguments.

## I.    HAMOC Wasn't Required to Register with the State

According to UHC, HAMOC "is a California debt collector" who "transacts with Florida medical providers to obtain contractual assignment rights on their allegedly unpaid or underpaid bills, and then seeks to collect on those bills." *Id.* at 5–6 (citing Complaint ¶¶ 5–10). UHC adds that "[d]ebt collectors must obtain and maintain valid licenses with the [Florida] Financial Services Commission's Officer of Financial Regulation"; otherwise, they "cannot legally bring suit to collect on the debt in Florida." *Id.* at 6–7. And (UHC says) HAMOC is "not registered to transact business in Florida, much less act as a regulated debt collector." *Id.* at 6; *see also* Florida Office of Financial Regulation Records [ECF No. 19-1] (showing that HAMOC is not a registered debt collector in Florida).[4] In response, HAMOC argues that these licensing requirements apply only to "debt collectors who collect run-of-the-mill debts" and to those "who are in the business of soliciting or collecting 'commercial claims'"—not to alleged debts between an insurance company and a medical provider. Response at 9–10. We agree with HAMOC.

This question requires us to analyze the interplay between two separate (but similar) Florida statutes: the Florida Commercial Collection Practices Act (the "Commercial Act"), FLA. STAT. §§ 559.541–.548, and the Florida Consumer Collection Practices Act (the "Consumer Act"), FLA. STAT. §§ 559.55–.785. The Florida Legislature enacted these statutes "as a means of regulating the activities

---

[4] UHC asks us to take judicial notice of the Florida Office of Financial Regulation's records as a "matter[ ] of public record[.]" Motion at 6 (quoting *Halmos v. Bombardier Aerospace Corp.*, 404 F. App'x 376, 377 (11th Cir. 2010)). HAMOC doesn't object to this request and, in any event, doesn't deny UHC's assertion that it (HAMOC) isn't a registered debt collector in Florida. *See generally* Response. So, we'll agree to take judicial notice of these records.

of consumer collection agencies within the state" and to curb "a series of abuses in the area of debtor-creditor relations." *LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1190 (11th Cir. 2010) (cleaned up). Both statutes require debt collectors to register with the State of Florida before conducting their debt-collection business in this state. *See* FLA. STAT. § 559.544(1) ("No person shall engage in business in this state as a commercial collection agency, as defined in this part, or continue to do business in this state as a commercial collection agency, without first registering in accordance with this part and thereafter maintaining such registration."); *id.* § 559.553(1) ("A person may not engage in business in this state as a consumer collection agency or continue to do business in this state as a consumer collection agency without first registering in accordance with this part, and thereafter maintaining a valid registration."); *see also LeBlanc*, 601 F.3d at 1197 (holding that the defendant had to comply with the Consumer Act's registration requirements because its "business activities clearly involve 'collecting or attempting to collect consumer debt' from debtors located within Florida by means of interstate communication originating from outside of the state").

But these statutes have their limits. Both the Commercial and Consumer Acts focus on certain types of debts and certain kinds of debt collectors. The Commercial Act applies only to "commercial collection agenc[ies]" that collect on claims "arising out of a transaction wherein credit has been offered or extended to any person, and the money, property, or service which was the subject of the transaction was *primarily for commercial purposes* and not primarily for personal, family, or household purposes[.]" FLA. STAT. § 559.543(1)–(2) (emphasis added). Similarly, the Consumer Act applies to debt collectors who "collect *consumer debt* from debtors located in [Florida]"—and "consumer debt" is defined as "any obligation or alleged obligation *of a consumer* to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes[.]" FLA. STAT. § 559.55(6), (11) (emphases

added).[5] HAMOC relies heavily on the text of the statutes, arguing that it is not "collect[ing] debts that involve 'credit being offered or extended to another person,' such as credit cards, mortgages, auto loans, etc.," and that the debts at issue here don't "come even close to being encompassed by the term 'commercial claim' as defined by the statute." Response at 10. We agree.

HAMOC says that UHC failed "to make proper payments and/or [underpaid] the [Providers], of amounts due and owing now to [HAMOC] for surgical care, treatment and procedures provided to Patients, who are insureds, members, policyholders, certificate-holders or otherwise covered for health, hospitalization and major medical insurance through policies or certificates of insurance issued and underwritten by [UHC]." Complaint ¶ 10. In other words, the Providers assigned HAMOC the alleged debt UHC owed them for underpaying "the healthcare expenses incurred" by its insureds. *Id.* ¶ 12. If this debt can be classified as either a "commercial claim" or "consumer debt" under Florida law, then we'd agree with UHC that HAMOC cannot attempt to collect these debts without first registering with the State. *See LeBlanc*, 601 F.3d at 1198 ("[R]equiring Unifund to register with the State of Florida before filing a lawsuit is a reasonable condition precedent to filing a claim."). But, under either the Consumer Act or the Commercial Act, we don't think HAMOC had to register with the State before collecting on these debts.

Starting with the Consumer Act, a debt owed by a *health insurance company* isn't a "consumer debt." We'll pause here to note that "the collection of medical debt" arising from *a patient's* failure to

---

[5] The Consumer Act's definition of consumer debt mirrors the definition in the federal Fair Debt Collection Practices Act ("FDCPA"). *See* 15 U.S.C. § 1692a(5) ("The term 'debt' means any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment."). And, while the FDCPA and the Consumer Act "are not identical," the Consumer Act "provides that, in interpreting it, courts must give 'great weight' to the interpretation of the federal act." *Alecca v. AMG Managing Partners, LLC*, 2014 WL 2987702, at *6 (M.D. Fla. July 2, 2014) (Davis, J.) (quoting FLA. STAT. § 559.77(5)).

pay his medical bills *is* a "consumer debt" for purposes of the FDCPA. *Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1122 (11th Cir. 2014); *see also Higgens v. Trident Asset Mgmt., LLC*, 2017 WL 2628404, at *2 (S.D. Fla. June 16, 2017) (Scola, J.) (citing cases for the proposition that "medical expenses are categorized as consumer debts for pleading purposes"). And at least one Florida appellate court has agreed that *a patient's* unpaid medical expenses also constituted a "consumer debt" under the Consumer Act. *See Steiner & Munach, P.A. v. Williams*, 334 So. 2d 39, 41–42 (Fla. 3d DCA 1976) (holding that "the defendant's conduct clearly [was] in violation of [the Consumer Act]" because it was trying to collect a $176.00 debt for "anesthesia during surgery"). But our question—*viz.*, whether a purported debt owed by an insurance company to a medical provider (or, in this case, its assignee) qualifies as "consumer debt"—is somewhat different.

To answer this question, we start (as always) with the text of the Consumer Act. *See Lawson v. FMR LLC*, 571 U.S. 429, 440 (2014) ("In determining the meaning of a statutory provision, 'we look first to its language, giving the words used their ordinary meaning.'" (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990))). In doing so, we must be mindful to "give meaning to every word and clause in a statute" and to reject any interpretation "that would render portions of a statute surplusage." *Bhd. of Locomotive Eng'rs & Trainmen v. CSX Transp., Inc.*, 522 F.3d 1190, 1195 (11th Cir. 2008). Fortunately, the Consumer Act is pellucid: A "consumer debt" is "any obligation or alleged obligation *of a consumer* to pay money arising out of a transaction[.]" FLA. STAT. § 559.55(6) (emphasis added). And "consumer" is defined as "*any natural person* obligated or allegedly obligated to pay any debt." *Id.* § 559.55(8) (emphasis added). It goes without saying that a large insurance company like UHC isn't a "natural person" and that, therefore, its debts aren't "consumer debts" under this law. *Cf. Yacht Assist, Inc. v. CRP LMC PROP Co., LLC*, 353 So. 3d 65, 67 (Fla. 4th DCA 2022) ("Plaintiff is a corporate entity and not a natural person."); *cf., e.g.*, *Reyes v. Julia Place Condo. Homeowners Ass'n Inc.*, 2015 WL 4619928, at *4 (E.D. La. July 29, 2015) ("However, as defendants correctly observed, 'consumer

debts', [under the FDCPA], may only be held by natural persons. . . . To be sure, past-due condominium assessments would yield a cognizable claim under the FDCPA *if* the party who had incurred them were a 'natural person.' The mere fact that past-due condominium assessments qualify as 'consumer debts' in the abstract may not abrogate the plain fact that these five corporate claimants fail to meet the initial and most fundamental requirement for recovery under the FDCPA: that they be 'consumers' as defined by the Act and, thus, 'natural persons.'").

Trying to parry, UHC insists that HAMOC is trying to collect a consumer debt because "the underlying medical debt that it solicited and obtained from the [Providers]" derives from "medical services . . . provided directly to [the] patients." Reply at 8. In other words, UHC is saying that the *true* debtors in this case (for Consumer Act purposes) are the individual patients who received medical treatment from the Providers. But HAMOC isn't trying to collect from the patients; it's trying to collect from UHC. HAMOC alleges that the debt it's owed derives from a purported oral agreement through which UHC agreed to reimburse the Providers at the UCR rate. *See* Complaint ¶ 433 ("As a further direct, legal and proximate result of [the Providers'] detrimental reliance on the oral agreement and the misrepresentations of [UHC]. [The Providers have] been damaged due to the loss of monies expended in providing said medical services for which it was significantly underpaid[.]"). What HAMOC never says is that *the patients* are indebted to UHC, the Providers, HAMOC, or anybody else. Put another way, any debt the patients might owe is utterly irrelevant to this action because HAMOC is trying to collect a specific debt UHC allegedly owes the Providers for the services the medical professionals provided to their insureds—nothing more, nothing less. *See Antoine v. State Farm Mut. Auto. Ins. Co.*, 662 F. Supp. 2d 1318, 1326 (M.D. Fla. 2009) (Melton, J.) ("Merely because an insurance policy purchased by a consumer is involved in the case does not render any debt resulting thereunder a consumer debt [under the Consumer Act]."); *see also, e.g.*, *Valhalla Inv. Props., LLC v. 502, LLC*, 832 F. App'x 413, 415 (6th Cir. 2020) (Thapar, J.) ("Valhalla tries to redefine the relevant payment

obligation to squeeze a natural person into the picture. The First Bank obligation was part of a larger set of transactions, it says, and one of those transactions was the agreement that Flex Yield's members would pay back their respective member advances to Flex Yield. But the defendants never tried to collect money from Hood or Kantz (natural persons) to satisfy their obligations to Flex Yield. Instead, the defendants bought First Bank's right to repayment, secured title to the condominium, and facilitated foreclosure. All of this was part of an attempt to collect payment on Flex Yield's obligation to First Bank. No natural person, no FDCPA protection.").

And the Commercial Act likewise doesn't apply to HAMOC. That statute governs collection agencies that are "in the business of soliciting [or collecting] commercial claims[.]" FLA. STAT. § 559.543(2). A "commercial claim" is defined as "any obligation for the payment of money or its equivalent arising out of a transaction wherein credit has been offered or extended to any person, and the money, property, or service which was the subject of the transaction was primarily for commercial purposes and not primarily for personal, family, or household purposes[.]" *Id.* § 559.543(1). As far as we can tell, no court—state or federal—has had occasion to decide whether a health insurance company's debt constitutes a "commercial claim" under this Florida law.

Again, however, we agree with HAMOC that, under the plain language of the statute, UHC's alleged debt isn't a "commercial claim" because it has nothing to do with a commercial transaction. As we've discussed, medical debt is a *consumer debt* (as defined by the Consumer Act) because it's an obligation to "pay money arising out of a transaction . . . for personal, family, or household purposes[.]" FLA. STAT. § 559.55(6); *see also ante*, at 7–9. But, since medical debt is "primarily for personal, family, or household purposes," it cannot be a "commercial claim" under the Commercial Act. FLA. STAT. § 559.543(1). Since UHC's debt isn't commercial, HAMOC didn't need to register under the Commercial Act before trying to collect it.

Because HAMOC didn't need to register with the State of Florida before bringing this action under either the Consumer Act or the Commercial Act, we **DENY** this first part of the Motion.

## II.     The Complaint is Indefinite as to Count 3

UHC next argues that HAMOC's Complaint is "too indefinite to support any of its causes of action." Motion at 8. As to Counts 1 and 2, UHC says that "HAMOC never alleges that [UHC] relayed that it would allow or pay for a specific amount," and that portions of the Complaint "demonstrate[ ] that the Providers already knew [UHC] would not be allowing or paying their interpretation of 'usual, customary, reasonable, and allowed' in numerous situations." *Id.* at 9–10. As to Count 3, UHC insists that HAMOC cannot state a viable claim under ERISA because HAMOC "admits that it does not have the health plans which allegedly cover the services at-issue. It is therefore not possible for HAMOC to allege that [UHC] did not administer the at-issue services in accordance with the health plan documents[.]" *Id.* at 11. We find that Counts 1 and 2 have been properly pled, but that Count 3 should be dismissed without prejudice and with leave to amend.

*First*, HAMOC has sufficiently alleged that UHC told the Providers that it would pay them a certain amount of money for each procedure and that UHC then reneged on those promises. For each patient, HAMOC alleges that a UHC representative told the Providers that UHC would "pay[ ] the UCR rate," even though UHC then reimbursed the Providers at the lower "Medicare rate." Complaint ¶¶ 41, 49; *see also id.* ¶¶ 74, 106, 138, 170, 202, 234, 266, 298, 330, 362, 394 (same). UHC contends that these allegations aren't good enough because the UCR rate "is not some definite term, but rather is plan-specific and varies." Motion at 9. "[B]ecause there is no allegation of any misrepresentation or promise to pay a specific amount," UHC says, "HAMOC (or the Providers) could not justifiably or reasonably rely on an alleged statement that [UHC] would pay or allow a [UCR rate]." *Id.* at 10.

It's true that the UCR rate doesn't refer to a specific price because—by definition—the UCR is based on "[t]he amount paid for a medical service in a geographic area based on what providers in

the area usually charge for the same or similar medical service." Complaint ¶ 20; *see also Urology Ctr. Of Ga.,* 2010 WL 797204, at *1 (same). But this variability doesn't mean that the UCR rate is some unknowable figure UHC has no hope of uncovering. HAMOC alleges that UHC *itself* "uses the term UCR in its policies" and "will utilize a medical bill database . . . to determine the exact dollar amount to be paid for a medical claim." Complaint ¶¶ 23–24. According to HAMOC, in other words, the UCR rate is "an objective payment rate established through an industry database known as Fair Health," and (HAMOC avers) UHC knows precisely what the UCR rate is for any given procedure at any given time in any given location because UHC uses the UCR rate in its own insurance policies. Response at 13.

Plus, HAMOC continues, the UCR rate is a commonly understood term in the health insurance field. *See* Complaint ¶ 19 ("Rather than use the words market rate to simplify terms, payors have long used words or combinations of words such as usual, reasonable, customary and allowed, all to mean an average payment for a procedure provided by similarly situated medical providers within similarly situated areas or places of practice ('UCR')."). And that seems right. *See, e.g., In re Managed Care Litigation,* 2011 WL 1595153, at *8 (S.D. Fla. Mar. 31, 2011) (Torres, Mag. J.) ("We conclude, then, that Plaintiffs have sufficiently stated a claim for breach of contract based on the allegations that Defendant elected to reimburse Plaintiffs pursuant to the UCR method but instead underpaid them."); *Brand Surgical Inst. v. Aetna Life Ins. Co.,* 2022 WL 2046205, at *6–7 (C.D. Cal. Mar. 7, 2022) ("Defendant disputes that a promise to pay at the UCR rate, as alleged by Plaintiff, could have been a clear and unambiguous promise, since . . . [the] UCR is a variable term which could be defined by various sources. However, Plaintiff alleges that Defendant itself uses the term 'UCR' in its policies and that entities who use this term in their policies are known to rely on a common database, the 'Fair Health database,' to calculate the exact dollar amount that will be paid. Moreover, as noted above, the Ninth Circuit has clearly defined this term and relied on it in its decisions. . . . Accepting [the plaintiff's]

particular allegations as true, it is clear that Defendant's use of the term 'UCR rate' is sufficiently clear and unambiguous." (cleaned up & citing *Delta Dental Plan of Cal., Inc. v. Mendoza*, 139 F.3d 1289, 1291 (9th Cir. 1998))).[6]

In any event, the Complaint plainly alleges that UHC promised to pay at the UCR rate, that it ultimately paid only at the Medicare rate, and that the Medicare rate is lower than the UCR rate. *See* Complaint ¶¶ 422–23 ("Defendant falsely represented to Medical Providers that payment for services would be based on UCR and not Medicare. Defendant knew that any payment made to Medical Providers would not be made [at] the UCR rate and would instead be made at the Medicare rate."); *see also, e.g., id.* ¶ 68 ("The amount paid was well below the billed amount and well below the UCR amount represented during the separate oral communications between [the Providers] and Defendant."). HAMOC has thus plausibly alleged that UHC owes it *some* amount of money, and we won't dismiss a complaint simply because the Plaintiff hasn't, at this very early stage of the litigation, computed the full amount of its damages *with exactitude. See Nat'l Indus., Inc. v. Sharon Steel Corp.*, 781 F.2d 1545, 1548 (11th Cir. 1986) ("Florida law does not require exactitude where it is certain that substantial damage has been caused; a reasonable basis in the evidence for the computation will suffice."); *Royal Typewriter Co. v. Xenographic Supplies Corp.*, 719 F.2d 1092, 1105 (11th Cir. 1983) ("[The plaintiff] need not show

---

[6] UHC relies on two cases—*Hapeville Dialysis Center v. City of Atlanta, Ga.*, 545 F. App'x 870 (11th Cir. 2013), and *Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614 (2d Cir. 2008)—for the proposition that HAMOC cannot allege a "misrepresentation or promise to pay a specific amount" because UCR rates "[are] not some definite term, but rather [are] plan-specific and var[y]," Motion at 9–10. We fail to see the relevance of these cases because their discussion of UCR rates is far too cursory for us to draw any meaningful parallels with our case. *See, e.g., Hapeville Dialysis*, 545 F. App'x at 873 ("The provisions of the summary plan description make it unambiguously clear that plaintiff is an out-of-network provider whom the Plan provisions provide will be paid the Plan's Usual, Customary, and Reasonable Fees or reimbursed at the Plan's Default Reimbursement Rate."); *Krauss*, 517 F.3d at 623 ("Moreover, Oxford's UCR definition, which provides that the UCR charge is the lesser of the amount charged or the amount Oxford determines to be the reasonable charge, confers upon Oxford discretionary authority regarding one of the Plan terms here at issue: UCR charges." (cleaned up)).

the precise amount of damages so long as the trier of fact can arrive at an intelligent estimate without speculation or conjecture.").

*Second*, the Complaint isn't "inconsistent" about whether the Providers "were on notice that the reimbursement rates allowed or paid by [UHC] were below what the Providers were seeking." Motion at 10. UHC says that the Providers *must have* been on notice that UHC wasn't reimbursing at the UCR rate because UHC had already underpaid the Providers for *other* patients. *See* Motion at 10 ("Hollywood Regional treated patient DC in February 2019 and submitted a health claim for medical code s2900, and then treated patient AS in December 2019 and submitted a health claim also for medical code s2900. HAMOC's allegation therefore that Hollywood Regional sincerely relied on any statements from [UHC] in December 2019 after already purportedly receiving an 'underpayment' on the very same code is at best inconsistent and cannot support either causes of action for negligent misrepresentation or promissory estoppel.").

But HAMOC alleges that, for each patient, the Providers contacted UHC *in advance* to ask about UHC's reimbursement practices, and that, as to each patient, UHC assured the Providers that it "pays the UCR rate." Complaint ¶ 42; *see also id.* ¶¶ 74, 106, 138, 170, 202, 234, 266, 298, 330, 362, 394 (same). Taking these allegations "as true and [viewing] them in the light most favorable to [HAMOC]," *Dusek*, 832 F.3d at 1246, we cannot say that the Providers were under some bizarre obligation to disregard UHC's own representations simply because the insurer had underpaid the Providers on some *other* debts. UHC seems to be saying, in other words, that the Providers shouldn't have trusted it to tell the truth in any given case because UHC had already proven itself to be untrustworthy in other cases. But we won't let a defendant off the hook on a misrepresentation claim on the argument—which it will be free to make to a jury if it can do so with a straight face—that the Providers shouldn't have been surprised by its duplicity because it always (or often) behaves duplicitously.

*But third*, UHC is right that it isn't "possible for HAMOC to allege that [UHC] did not administer the at-issue services in accordance with the health plan documents" because HAMOC never identifies what provision of the alleged ERISA plans were violated. Motion at 11. Our District's cases are clear that "[a] plaintiff who brings a claim for benefits under ERISA must identify a *specific plan term* that confers the benefit in question." *Sanctuary Surgical Ctr., Inc. v. UnitedHealth Grp., Inc.*, 2013 WL 149356, at *3 (S.D. Fla. Jan. 14, 2013) (Hurley, J.) (emphasis added) (quoting *Stewart v. Nat'l Educ. Ass'n*, 404 F. Supp. 2d 122, 130 (D.D.C. 2005)); *see also, e.g.*, *H.H. v. Aetna Ins. Co.*, 342 F. Supp. 3d 1311, 1316 (S.D. Fla. 2018) (Middlebrooks, J.) ("To state a plausible claim under ERISA, then, a plaintiff must provide the court with enough factual information to determine whether the services were indeed covered services under the plan. A plaintiff must identify a specific term of the plan that covers the services at issue and must provide facts sufficient to show that the services meet whatever requirements the plan imposes for coverage." (cleaned up)); *In re Managed Care Litigation*, 2009 WL 742678, at *3 (S.D. Fla. Mar. 20, 2009) (Moreno, C.J.) ("Furthermore, the failure to properly allege the existence of an ERISA plan also makes it impossible for Plaintiffs to sufficiently allege the basis of Defendants' liability under a given plan."); *Columna, Inc. v. UnitedHealthcare Ins. Co.*, 2019 WL 2076796, at *3 (S.D. Fla. Apr. 29, 2019) (Dimitrouleas, J.) ("In order to provide Defendants with notice of the claims against them, Plaintiff must 'at least identify the specific plan provisions under which coverage is conferred' with respect to each of the ERISA claims in the Complaint and 'allege sufficient facts to plausibly show the services rendered to each patient were indeed covered under that *particular* plan.'" (quoting *Sanctuary Surgical Ctr.*, 2013 WL 149356, at *3)).

HAMOC says only that "each Patient's health plan at issue in this litigation is a health plan governed by [ERISA]," Complaint ¶ 28, and that, "under the terms of the Patient's ERISA Plan, Defendant is obligated to pay based on [the Provider's] billed amount," *id.* ¶ 62. That isn't good enough. To bring a claim under ERISA, HAMOC must (1) "identify a specific plan term that confers

the benefit in question" and (2) "provide . . . enough factual information to determine whether the services were indeed covered services under the plan[.]" *Sanctuary Surgical Ctr.*, 2013 WL 149356, at *3. Since HAMOC hasn't done either, *see generally* Complaint, Count 3 is improperly pled and must be dismissed.

Although Counts 1 and 2 of HAMOC's Complaint are sufficiently detailed and otherwise comply with Rule 8's pleading standards, Count 3 fails to state a claim under ERISA. We'll therefore **DISMISS** Count 3 of the Complaint *without prejudice* and *with leave to amend*—but **DENY** this portion of the Motion as it relates to Counts 1 and 2.

### III.    ERISA Doesn't Preempt HAMOC's Claims

UHC also contends that ERISA "preempts HAMOC's claims of negligent misrepresentation and promissory estoppel" (as alleged in Counts 1 and 2 of the Complaint). Motion at 11. According to UHC, HAMOC's claim that "payment [should have been] made at a 'UCR rate' and not a 'Medicare rate'" is unavoidably linked with "how the ERISA health plan was administered and what was allowed[.]" *Id.* at 13. In UHC's view, then, HAMOC's state-law claims "'relate to' an ERISA plan and are defensively preempted." *Ibid.* HAMOC advances two counterarguments. *One*, HAMOC says that its claims are not "related to an ERISA plan" but instead "arise out of independent wrongful conduct it alleges the Defendant engaged in." Response at 14 (cleaned up). *Two*, HAMOC maintains that challenges "to the 'rate of payment'" are "not preempted, because [they] do not fall within the scope of ERISA." *Id.* at 16 (cleaned up).

"A major component of ERISA—designed to help effectuate its broad and comprehensive scope—is its preemption provision, which 'supersede[s] any and all State laws insofar as they may now or hereafter relate to any employment benefit plan covered by ERISA.' ERISA's preemption clause 'is conspicuous for its breadth' and must be 'expansively applied' to conclusively preempt 'all state laws that relate to ERISA covered plans.'" *Vanguard Plastic Surgery, PLLC v. UnitedHealthcare Ins. Co.*,

658 F. Supp. 3d 1250, 1255–56 (S.D. Fla. 2023) (Altman, J.) (first quoting *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 147 (2001); and then quoting *Swerhun v. Guardian Life Ins. Co. of Am.*, 979 F.2d 195, 197 (11th Cir. 1992)). "ERISA is one of only a few federal statutes under which two types of preemption may arise: conflict [or defensive] preemption and complete preemption." *Conn. State Dental Ass'n v. Anthem Health Plans, Inc.*, 591 F.3d 1337, 1343 (11th Cir. 2009). Defensive preemption "arises from ERISA's express preemption provision" and "preempts any state law claim that 'relates to' an ERISA plan." *Id.* at 1344 (quoting 29 U.S.C. § 1144(a)). Complete preemption is "jurisdictional in nature" and "converts an ordinary state common law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule." *Ibid.* (quoting *Metro Life Ins. Co. v. Taylor*, 481 U.S. 58, 65–66 (1987)). "[C]omplete and defensive preemption are not coextensive," since a "state-law claim may be defensively preempted . . . but not completely preempted[.]" *Ibid.* (quoting *Cotton v. Mass. Mut. Life Ins. Co.*, 402 F.3d 1267, 1281 (11th Cir. 2005)). UHC argues that Counts 1 and 2 are *defensively* preempted. *See* Motion at 13 ("[A]ccepting HAMOC's allegations in the Complaint as true, the causes of action alleged by HAMOC 'relate to' an ERISA plan and are defensively preempted.").

We'll start by rejecting HAMOC's second counterargument. HAMOC has identified a line of cases holding that, "[f]or purposes of determining ERISA preemption, a challenge to the 'rate of payment' does not necessarily implicate an ERISA plan, but a challenge to the 'right to payment' under an ERISA plan does." Response at 16 (quoting *Surgery Ctr. of Viera, LLC v. Meritain Health, Inc.*, 2020 WL 7389987, at *8 (M.D. Fla. June 1, 2020) (Hoffman, Mag. J.), *report and recommendation adopted*, 2020 WL 7389447 (M.D. Fla. June 16, 2020) (Byron, J.)). But, as UHC points out (Reply at 10), this distinction applies only to claims of *complete preemption*—and not, as here, to claims of *defensive preemption*. *See, e.g.*, *Premier Inpatient Partners LLC v. Aetna Health & Life Ins. Co.*, 371 F. Supp. 3d 1056, 1066 (M.D. Fla. 2019) (Scriven, J.) ("[T]o determine whether removal under § 1441 was proper based on ERISA [complete] preemption . . . . resolution of the 'rate of payment' and 'right of payment' distinction is

dispositive of whether a claimant could have brought its claim under ERISA." (cleaned up) (quoting *Conn. State Dental Ass'n*, 591 F.3d at 1350); *Surgery Ctr. of Viera, LLC v. Cigna Health*, 2020 WL 4227428, at *2 (M.D. Fla. July 23, 2020) (Dalton, J.) ("True—recent case law has established the rate/right distinction, but only in complete preemption cases where the issue was subject matter jurisdiction."); *Worldwide Aircraft Servs. Inc. v. Worldwide Ins. Servs., LLC*, 2024 WL 4416825, at *5 (M.D. Fla. Oct. 4, 2024) (Jung, J.) (rejecting a claim of complete preemption where the "Plaintiff's Complaint [wa]s only raising a rate of payment challenge"). HAMOC's "rate of payment" cases, in other words, are totally inapposite here.

Even so, we disagree with UHC that HAMOC's state-law claims necessarily "relate to" an ERISA plan. Counts 1 and 2 of the Complaint allege that UHC misrepresented what it would pay the Providers for certain medical services. *See* Complaint ¶ 422 ("Defendant falsely represented to Medical Providers that payment for services would be based on UCR and not Medicare."); *id.* ¶¶ 429–30 ("Medical Providers only decided to provide services because they were assured that payment would be made at the UCR rate not based on Medicare. After assuring and promising Medical Providers that payment would be at the UCR rate, Defendant should have reasonably expected that Medical Providers would then go on to provide medical services expecting that payment would be made at that rate."). And UHC's (alleged) obligation to pay the Providers a given UCR rate for their services arises *not* from the terms of an ERISA plan but from oral agreements between UHC and the Providers. *See, e.g.*, *id.* ¶ 42 ("Defendant represented to HRSC that for services in connection with these procedure codes, Defendant pays the UCR rate.").[7]

---

[7] Although HAMOC never says so explicitly, the Complaint seems clear that the Providers didn't have *any other* contractual relationship with UHC—much less an agreement based on an ERISA plan— when they agreed to perform medical services for the patients named in the Complaint. *See* Complaint ¶¶ 16–19 ("[W]hen a medical provider does not have a written contract or preferred provider agreement with a health plan, the medical provider receives no referrals from the health plan. . . . The reason why medical providers have chosen to forgo the benefits of a contract with a payor is that, in

As we've explained in another case, "the 'mere fact' that [the Providers] treated a patient who happens to have an ERISA plan doesn't mean that every legal issue concerning that treatment is now 'related' to that plan." *Vanguard Plastic Surgery*, 658 F. Supp. 3d at 1258 (quoting *Sarasota Cnty. Pub. Hosp. Bd. v. Blue Cross & Blue Shield of Fla., Inc.*, 511 F. Supp. 3d 1240, 1249 (M.D. Fla. 2021) (Merryday, J.)). Both the Eleventh Circuit and district courts within the Circuit have consistently held that state-law claims premised on an insurance company's failure to fully reimburse a medical provider *are not* preempted by ERISA—provided that the duty to pay the medical provider doesn't arise from the terms of an ERISA plan. *See Lordmann Enters., Inc. v. Equicor, Inc.*, 32 F.3d 1529, 1533 (11th Cir. 1994) ("Congress enacted ERISA to protect the interests of employees and beneficiaries covered by benefit plans. Preemption in a third-party health care provider case would defeat rather than promote this goal. The commercial realities of the health care industry require that health care providers be able to rely on insurers' representations as to coverage. If ERISA preempts their potential causes of action for misrepresentation, health care providers can no longer rely as freely and must either deny care or raise fees to protect themselves against the risk of noncoverage." (cleaned up)); *S. Broward Hosp. Dist. v. ELAP Servs., LLC*, 2020 WL 7074645, at *9 (S.D. Fla. Dec. 3, 2020) (Singhal, J.) ("[T]he District is not seeking payment under the ERISA Plans. In fact—and as discussed above—the ERISA Plans at issue in this action do *not* have such contracts with the District for pre-negotiated reimbursement rates. . . . The District does not ask the Court to interpret or rely on any provision of an ERISA plan whatsoever. Its claims are premised on misrepresentations and omissions by Defendants, not pre-

---

recent years, many insurers . . . contracted rates for in-network providers have been so meager, one-sided and onerous, that many providers have determined that they cannot afford to enter into such contracts. As a result, a growing number of medical providers have become noncontracted or out of network providers. Payors and insurers still want their patients to be seen and so they commonly promise to pay out of network providers a percentage of the market rate for the procedure, also described as, an average payment for the procedure performed or provided by similarly situated medical providers within similarly situated areas or places of practice.").

approval to perform medical services based on the plans."); *Surgery Ctr. of Viera, LLC v. UnitedHealthcare, Inc.*, 465 F. Supp. 3d 1211, 1223 (M.D. Fla. 2020) (Conway, J.) ("In the cases in which individual employees or physicians brought state law claims to recover for medical services, the plaintiffs were either parties to the ERISA plans or sought to enforce terms of the ERISA plans and, accordingly, Congress created uniform federal causes of action for their recovery under the ERISA statute. In cases such as Surgery Center's, in which the Plaintiff is an out-of-network or 'non-participating' healthcare provider and not seeking payment under the Plan, the state law claims do not 'relate to' the ERISA plan."); *see also Vanguard Plastic Surgery*, 658 F. Supp. 3d at 1259 (citing additional cases).

In the face of all this, UHC offers two arguments—both unpersuasive. *First*, UHC cites *Griffin v. Coca-Cola Refreshments USA, Inc.*, 989 F.3d 923 (11th Cir. 2021), for its view that HAMOC's claims impermissibly "seek to modify the ERISA plan by imposing additional legal obligations upon" UHC. Motion at 14. But HAMOC is doing nothing of the sort. As we've just discussed, UHC's alleged obligation to pay the Providers arises from (alleged) *oral* agreements between UHC and the Providers. *See* Response at 18 ("Defendant tries to argue around the Plaintiff's negligent misrepresentation and promissory estoppel State Law Causes of Action, by first recasting them as modifications of the Plans and then attacking this strawman of its own making. . . . [A]s a factual matter, Plaintiff's State Law Causes of Action are based on Defendant's oral representations without regard to what is, or is not, contained in any Plan. These representations and promises vested the Medical Providers with rights to payment separate and apart from any Plan terms."). The terms of the patients' ERISA plans are thus totally irrelevant to Counts 1 and 2.[8] In any event, the portion of *Griffin* UHC relies on is irrelevant

---

[8] Of course, HAMOC's argument calls into question the viability of Count 3—which alleges that the Providers and HAMOC are entitled to "recover benefits and enforce rights to benefits under [ERISA]." Complaint ¶ 438. But, at this stage of the proceedings, HAMOC may "state as many separate claims or defenses as it has, regardless of consistency." FED. R. CIV. P. 8(d)(3).

for the separate reason that, in it, the Circuit was telling us when an ERISA plan's anti-assignment provisions are subject to equitable estoppel. *See* 989 F.3d at 936 ("Griffin argues that Defendants are equitably estopped from relying on the anti-assignment provisions . . . . In the ERISA context, equitable estoppel applies when the plaintiff can show that (1) the relevant provisions of the plan at issue are ambiguous, and (2) the plan provider or administrator has made representations to the plaintiff that constitute an informal interpretation of ambiguity." (cleaned up)). Whether the patients' ERISA plans have an enforceable anti-assignment provision is, again, totally irrelevant to the existence of the oral agreements between UHC and the Providers.

*Second*, UHC contends that the Eleventh Circuit's decision in *Lordmann Enterprises* doesn't apply to our case *both* because it's "distinguishable" *and* because "subsequent case law held that the exact types of causes of action HAMOC attempts to plead . . . are preempted." Motion at 14. This is also wrong. The Eleventh Circuit held in *Lordmann Enterprises* that "ERISA does not preempt a health care provider's [state-law] negligent misrepresentation claim against an insurer under an ERISA plan" because "a health care provider's claim against a provider of insurance under the plan affects the relationship between the principal ERISA entities at best only indirectly." 32 F.3d at 1533–34. That seems pretty much on all-fours with our case, where a medical provider's assignee (HAMOC) is asserting state negligent-misrepresentation and promissory-estoppel claims against an insurance company for failing to reimburse the Providers at an agreed-upon rate—a rate the parties arrived at in *oral* communications.

And none of UHC's cases abrogated or otherwise called into question *Lordmann Enterprises'* holding or its obvious applicability to our facts. In *Variety Children's Hospital, Inc. v. Century Medical Health Plan, Inc.*, 57 F.3d 1040 (11th Cir. 1995), for example, the Eleventh Circuit found that "claims of fraud and misrepresentation [that] are based upon the failure of a covered plan to pay benefits" are preempted by ERISA. *Id.* at 1042. But the court quickly clarified (citing to *Lordmann Enterprises*) that a

claim of promissory estoppel *wouldn't* be preempted "where an insurer represents to the health care provider that a specific treatment is fully covered under the policy and only after . . . informs the provider that the policy contains a significant limitation on that coverage." *Id.* at 1043 n.5. Our case (like *Lordmann Enterprises*) is about payment—not coverage—so *Variety Children* simply doesn't apply here.

The Eleventh Circuit's decision in *Garren v. John Hancock Mutual Life Insurance Co.*, 114 F.3d 186 (11th Cir. 1997), is equally inapposite, since it involved a challenge by *the beneficiary* of an ERISA plan against the denial of coverage. *See id.* at 187 ("Plaintiff, Curtis Garren, appeals the dismissal of this action under [ERISA], in which he alleged his employment benefit plan wrongfully denied his son's medical claims."). Our case (it goes without saying) isn't about the denial of coverage, and neither the Providers nor HAMOC were parties to (or beneficiaries of) any ERISA plan.

Our Circuit's precedents are thus clear that an underpaid health care provider's state-law fraud and misrepresentation claims against a health insurance company *aren't* preempted by ERISA. We therefore **DENY** this third part of UHC's Motion.

## IV.    The Anti-Assignment Argument is Premature

UHC's final argument is that its ERISA plans "often contain unambiguous anti-assignment provisions," which will "serve as a bar to HAMOC pursuing any relief under any cause of action from [UHC]." Motion at 16. Conceding, however, that this argument is premature, UHC asks us to "reserve ruling on the application of the anti-assignment provisions in plan documents while additional facts develop and HAMOC provides details permitting identification of the Members, the applicable plan documents[,] and the health services and health claims at issue." *Ibid.*; *see also* Reply at 11 ("[I]f the Court does not grant its Motion to Dismiss on the grounds explained above and in the Motion to Dismiss, [UHC] requests the Court reserve on the portion relating to the anti-assignment clauses."). We won't be doing that. *See World Fuel Servs., Inc. v. First Serv. Bank*, 2024 WL 3673018, at *6 (S.D. Fla.

Aug. 6, 2024) (Altman, J.) (explaining that district courts have "broad discretion in deciding how to best manage the cases before [them]," including the "discretion to stay proceedings as an incident to [the courts'] power to control [their] own docket[s]" (first quoting *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1366 (11th Cir. 1997); and then quoting *Clinton v. Jones*, 520 U.S. 681, 683 (1997))).

We will, however, allow UHC to raise this anti-assignment argument later—either in a motion for judgment on the pleadings or at summary judgment. *Cf. Chen v. Cayman Arts, Inc.*, 2011 WL 1085646, at *2 (S.D. Fla. Mar. 21, 2011) (Cohn, J.) ("[A] party may raise certain defenses (failure to state a claim, failure to join a person required by Rule 19(b), or a legal defense to a claim) after an initial Rule 12 motion to dismiss. . . in a Rule 12(c) motion[.]" (citing FED. R. CIV. P. 12(h))). For now, though, since UHC hasn't shown that HAMOC's claims are barred by an anti-assignment provision, we **DENY** this final part of the Motion to Dismiss.

### CONCLUSION

After careful review, we **ORDER and ADJUDGE** as follows:

1. The Defendant's Motion to Dismiss [ECF No. 19] is **GRANTED in PART** and **DENIED in PART**. Count 3 of the Complaint is **DISMISSED without prejudice**. All other aspects of the Motion to Dismiss are **DENIED**.

2. The Plaintiff may file an amended complaint by **November 6, 2024**.

3. By **October 31, 2024**, the parties shall file an amended joint scheduling report, as required by S.D. FLA. L.R. 16.1(b)(2).

4. The Clerk shall **LIFT** the stay and **REOPEN** this case.

   **DONE AND ORDERED** in the Southern District of Florida on October 22, 2024.

   _____
   **ROY K. ALTMAN**
   **UNITED STATES DISTRICT JUDGE**

cc:      counsel of record

23